Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc., 2011 NCBC 6.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 0691

CROCKETT CAPITAL CORPORATION,

      Plaintiff,

v.

INLAND AMERICAN WINSTON HOTELS,
INC. and  WINN LIMITED PARTNERSHIP,

      Defendants.

**ORDER AND OPINION**

{1}    This matter is before the Court on cross-motions for summary judgment. After considering the briefs submitted, other submissions of counsel, and oral argument, the Court concludes that Plaintiff's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

> *Robinson, Bradshaw & Hinson, P.A. by John R. Wester, Louis A. Bledsoe, III, and Richard C. Worf, Jr. for Plaintiff.*
>
> *Moore & Van Allen PLLC by Scott M. Tyler and Karin M. McGinnis, and DLA Piper US LLP by Jeffrey D. Herschman and Megan Hanley Baer for Defendants.*

Tennille, Judge.

I.

PROCEDURAL BACKGROUND

{2}    This action was filed in Wake County Superior Court on January 16, 2008. Plaintiff Crockett Capital Corporation filed the Notice of Designation simultaneously with the Complaint on January 16, 2008.  The case was designated a mandatory complex business case by Order of the Chief Justice on January 17, 2008, and subsequently assigned to the undersigned Special Superior Court Judge

for Complex Business Cases by the Chief Special Superior Court Judge for Complex Business Cases. Plaintiff filed an Amended Complaint on March 6, 2008.

{3} On March 13, 2009, this Court denied Defendants' Motion to Dismiss.

{4} By order dated May 5, 2009, this action was consolidated with a related case, *Inland Am. Winston Hotels, Inc. v. Winston*, No. 08 CVS 021786 (N.C. Super. Ct., filed Dec. 12, 2008) (hereinafter "*Inland v. Winston*"), for discovery purposes.

{5} In this action, both Plaintiff and Defendants filed motions for summary judgment on June 16, 2010. They each filed briefs in opposition to the motions for summary judgment on July 19, 2010, and each filed a reply on August 2, 2010. The Court heard oral argument on the motions for summary judgment on September 23, 2010.

II.

FACTS

A.

THE PARTIES

{6} Plaintiff Crockett Capital Corporation ("Plaintiff" or "Crockett Capital") is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. Plaintiff is engaged in the business of developing and managing hotel properties. It is owned by Kenneth R. Crockett ("Crockett") and Robert W. Winston, III ("Winston"), both residents of Wake County.

{7} Defendant Inland American Winston Hotels, Inc. ("Inland") is a Delaware corporation with its principal place of business now in Oak Brook, Illinois. When this lawsuit was filed, and during most of the events described in this Order and Opinion, Inland's principal place of business was in Raleigh, North Carolina.

{8} Defendant WINN Limited Partnership ("WINN") is a North Carolina limited partnership with its principal place of business now in Oak Brook, Illinois. When this lawsuit was filed, and during most of the events described in this Order and Opinion, WINN's principal place of business was in Raleigh, North Carolina. Defendant Inland is the general partner of WINN.

{9}   Inland and WINN are engaged in the business of owning and operating hotels and other hospitality properties.

{10}   Inland and WINN will be referred to collectively as the "Defendants."

B.

OVERVIEW

{11}   Inland American Real Estate Trust, Inc. ("Inland American") is the parent of Inland.  On July 1, 2007, a wholly-owned subsidiary of Inland American acquired all of Winston Hotels, Inc.'s ("Winston Hotels") capital stock and later became Inland.  At that time, Winston Hotels was a North Carolina public corporation and the general partner of WINN.  It owned and developed hotels throughout the country, with a concentration in the southeastern United States.  (Affidavit of Kenneth R. Crockett ("Crockett Aff.") ¶ 3.)  Winston and Crockett, Plaintiff's owners and key executives, were key executives with Winston Hotels before the acquisition.

{12}   In April 2007, Inland American entered into a contract with Winston Hotels under which Inland American's wholly-owned subsidiary would merge with Winston Hotels.  (Second Am. Compl. ("Compl.") ¶ 9; Answer to Second Am. Compl. ("Answer") ¶ 9.)

{13}   At the time of the merger, Winston Hotels had fifty (50) hotels in its portfolio.  (Crockett Aff. ¶ 3.)  Additionally, several hotel development projects were in various stages of consideration and review by Winston Hotels.  (Compl. ¶ 7; Answer ¶ 7.)  As a result of the merger that created Inland, Defendants acquired ownership of hotel properties then under construction and either ownership or an interest in "certain other properties that may be suitable for development as hotel projects . . . ."  (Agreement Regarding Development Projects executed by Crockett Capital, Inland, and WINN on July 30, 2007 and made effective July 1, 2007 ("Master Agreement") at ¶ A.)  The undeveloped projects consisted of thirteen (13) identified properties, termed the "Pipeline Properties."  (Master Agreement, Ex. B.)  The Pipeline Properties include the four properties which are the subject of this case: a Westin-branded hotel in Research Triangle Park ("RTP Westin"), a proposed

Aloft-branded hotel near RDU airport ("RDU Aloft"), a proposed Aloft-branded hotel in Chapel Hill ("Chapel Hill Aloft"), and a proposed combination Aloft/Hilton-branded hotel in downtown Raleigh ("Raleigh Hampton/Aloft"). (Master Agreement, Ex. B; Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Summ. J. Br.") 3.)

{14} Both Crockett and Winston had extensive experience in the development of hotel properties. (Compl. ¶ 10.) They previously managed Winston Hotels, and, therefore, they were familiar with the properties that Winston Hotels targeted for potential development. (Compl. ¶ 10.) Many of the hotels that Winston Hotels owned had been developed and built by Winston Hotels under the immediate supervision of Crockett and the ultimate supervision of Winston. (Crockett Aff. ¶ 3.)

{15} The task of developing hotels is a complex one. Normally, before construction begins, a development company must obtain control of the hotel site, procure a suitable hotel design, obtain a franchise agreement from a national franchisor, obtain market studies to determine the feasibility of building the hotel, secure necessary government approvals, obtain an agreement with a general contractor, arrange financing, and procure furnishings, fixtures, and equipment, among other things. (Compl. ¶ 12; Answer ¶ 12; Dep. of Tom McGuiness ("McGuiness Dep.") at 32:12–19.)

{16} Before the acquisition of Winston Hotels, neither Inland American nor its affiliates had ever owned a hotel property or developed a hotel property. (Compl. ¶ 11; Answer ¶ 11.)

C.

THE MASTER AGREEMENT

{17} In late April or May 2007, as the merger was proceeding to closing, Inland American began negotiating with Crockett and Winston what later became the "Agreement Regarding Development Projects" ("Master Agreement"). (Compl. ¶ 15; Answer ¶ 15; Dep. of Thomas H. McAuley ("McAuley Dep.") at 40:20–41:3.) The parties initially negotiated a non-binding Memorandum of Understanding that set

out the major terms of the deal and the parties' intentions. (McAuley Dep. at 40:20–41:3.) The Memorandum of Understanding was complete by late May 2007. (McAuley Dep. at 92:5–14, 101:9–23.) The parties then reduced the Memorandum of Understanding to the terms contained in the Master Agreement.

{18} The negotiations leading to the execution of the Master Agreement at times were contentious. For example, on June 28, 2007, Crockett sent an email to his attorney, Mr. Bunch, about the ongoing negotiations in which he stated that Inland had not been treating him very well and was reneging on prior commitments. (*Inland v. Winston*, Mem. of Law in Opp'n to the Mot. for Summ. J. Filed by Defs. William W. Bunch, III and Brown & Bunch, PLLC ("Pl.'s Resp. Br."), Ex. 6: E-mail from Kenneth Crockett to William Bunch (June 28, 2007, 22:01 EDT).) Crockett indicated that he might reassess the situation the following week. (*Inland v. Winston*, Pl.'s Resp. Br., Ex. 6: E-mail from Kenneth Crockett to William Bunch (June 28, 2007, 22:01 EDT).) After sending the June 28, 2007 email, Crockett spoke via telephone to Inland's Chairman, Dan Goodwin. (Dep. of Kenneth R. Crockett ("Crockett Dep.") at 310:23–311:9.) Crockett believed that Mr. Goodwin had assured him that Inland intended to go forward with the Agreement. (Crockett Dep. at 310:23–311:9.)

{19} Negotiating the Master Agreement extended beyond the close of the merger on July 1, 2007. (Pl.'s Summ. J. Br. 2.) The Master Agreement was executed on July 30, 2007 by Inland, WINN, and Crockett Capital and made effective retroactively to July 1, 2007. (Pl.'s. Summ. J. Br. 1.) Crockett signed the Master Agreement on behalf of Crockett Capital, which had been formed on July 11, 2007. Brent West, Executive Vice President and Chief Financial Officer of Inland and WINN, signed the Master Agreement on behalf of Defendants with authorization from his superiors. (Dep. of Michael Broadfoot ("Broadfoot Dep.") at 45:19–21.)

{20} After the merger, Defendants engaged Crockett Capital to provide: (1) construction management services for the hotel properties under construction; (2) "projections needed in determining the feasibility and investment return for the

development of the Pipeline Properties;" and (3) "development, construction management, and property management services with respect to those properties which Inland determines to develop as hotel properties." (Master Agreement ¶ B.) The Master Agreement outlined the potential ownership and development of the thirteen (13) Pipeline Properties. (Master Agreement ¶¶ C, 3.)

{21} Through the Master Agreement, Plaintiff and Defendants sought to combine their strengths. Crockett had the development expertise, and Defendants had access to capital to fund development. (Crockett Aff. ¶ 3; McGuiness Dep. at 39:7–10.) Crockett Capital would pursue the Pipeline Properties and give Inland an opportunity to participate in the development of them. (Master Agreement ¶ 2.) If Inland elected not to participate and Crockett Capital wanted to develop the property, Inland would convey its rights in the property to Crockett Capital (or an affiliate), and Crockett Capital would reimburse Inland for its Pursuit Costs. Crockett Capital could then develop the property on its own or with another investor. (Master Agreement ¶ 5.) Also, Crockett could pursue the development of properties other than the Pipeline Properties ("New Properties") to develop with Inland, with a third party, or alone. (Master Agreement ¶ 6.)

{22} The Master Agreement set out a three-stage process under which Inland would choose either to participate with Crockett Capital in developing and owning the hotels, or decline to participate and allow Crockett Capital to develop the hotels on its own. (Pl.'s Summ. J. Br. 3.) Pursuant to Paragraph 2 of the Master Agreement, Crockett Capital agreed to evaluate the Pipeline Properties and to submit to Defendants a "preliminary development package" for each of them. (Master Agreement ¶ 2.) Within thirty (30) days of the execution of the Master Agreement, Crockett Capital would submit to Inland a "preliminary development package" for four (4) properties, including the Chapel Hill Aloft and the RDU Aloft. (Master Agreement ¶ 2.) A "preliminary development package" for the remaining nine (9) properties was due within sixty (60) days of the execution of the Master Agreement. (Master Agreement ¶ 2.)

{23}   The "preliminary development package" was to include, among other things, a "single page investment description," "proposed franchisors," a "preliminary cost budget," "projected net operating income for the first three years of hotel operations," "preliminary proposed equity percentages" ranging from five (5) to twenty (20) percent for Crockett Capital and the remainder to Inland, "projected leverage returns to equity," and "anticipated Pursuit Costs and a preliminary Pursuit Schedule." (Master Agreement ¶ 2.) Pursuit Costs and Pursuit Schedule were defined terms in the Master Agreement. (*See* Master Agreement ¶ 2.)

{24}   Upon receipt of a preliminary development package, Inland had ten (10) days to provide written notice to Crockett Capital of its decision to pursue the development of a particular Pipeline Property. (Master Agreement ¶ 2.) If Inland elected to pursue a specific property, it would be obligated to pay its share of approved Pursuit Costs "as such Pursuit Costs are incurred, including any such costs already incurred by [Crockett Capital] to date." (Master Agreement ¶ 2.) Likewise, Crockett Capital would be required to reimburse Inland for its share of the approved Pursuit Costs already paid by Inland, based on Crockett Capital's "proposed equity percentage for the joint venture ownership of the property." (Master Agreement ¶ 2.)

{25}   If Inland chose to pursue development, Crockett Capital would produce a second, more detailed "pre-development package" to Inland in accordance with the Pursuit Schedule submitted with the "preliminary development package" and approved by Inland. (Master Agreement ¶ 2.) This submission would include, among other things, "updated proposed equity ownership percentages for the proposed project," "a detailed description of the investment, including conceptual drawings or a rendering of the proposed development," "a map showing the location of competing hotel projects," "a detailed estimate of development and construction cost," "proposed debt structure and equity contributions," and "an updated estimate of Pursuit Costs." (Master Agreement ¶ 2.) Again, Defendants were required to provide written notice within ten (10) days if they wished to continue in the

development of a particular property "based upon, among other things, the [Crockett Capital] submissions." (Master Agreement ¶ 2.)

{26} If Defendants elected to proceed beyond this stage, Crockett Capital would create a third and final development package to Inland. (Master Agreement ¶ 2.) This submission would include a "final proposed development cost estimate based on a lump sum or guaranteed maximum price for construction from a designated general contractor" and "environmental and marketing studies satisfactory to Inland in its reasonable discretion." (Master Agreement ¶ 2.) Additionally, if requested, Crockett Capital would be required to make a telephonic presentation to Inland's board of directors regarding each Pipeline Property being considered. (Master Agreement ¶ 2.)

{27} Upon submission of a final development package, if Inland elected to continue development, the Master Agreement required Crockett Capital and Inland (or its affiliates) to form a limited liability company to own and operate the property as a "Joint Venture." (Master Agreement ¶ 3.) Each Joint Venture was to be governed by an operating agreement that was in "substantially" the same form as the operating agreement attached to the Master Agreement as Exhibit E. (Master Agreement ¶ 3.) Exhibit E is a detailed limited liability company agreement. It leaves only four terms open: (1) the name of the limited liability company to be formed, (2) the date of its creation, (3) the date the Certificate of the LLC was filed, and (4) the capital contributions to be made by Plaintiff and Defendants. (Pl.'s Summ. J. Br. 28.) Those items would have been set forth in the development package agreed to by the parties.

{28} In order to comply with Internal Revenue Code Regulations with respect to real estate investment trusts ("REITs"), Paragraph 3 of the Master Agreement further required each Joint Venture to "lease the Pipeline Property to an operating entity." (Master Agreement ¶ 3.) The leases were to be "'substantially similar' to the leases used by WINN . . . in other projects for purposes of compliance with REIT regulations." (Master Agreement ¶ 3.) An example or form lease, however, was not included with the Master Agreement. Paragraph 3 of the Master Agreement sets a

"5-year [lease] term[] with automatic renewals" at the current market rental rate, but it does not set a specific base rent. (Master Agreement ¶ 3.) Instead, Paragraph 3 provides a formula for determining the base rent which includes "property taxes, casualty insurance premiums, and a reasonable capital reserve." (Master Agreement ¶ 3.) The parties were to have the same ownership interest in each lease as they had in the corresponding Joint Venture. (Compl. ¶ 16.)

{29}   The parties agreed that Crockett Capital would provide construction management and hotel management services for each Joint Venture. (Master Agreement ¶ 4.) With respect to hotel management, the parties agreed to execute an agreement "in substantially the form" of Exhibit D to the Master Agreement. (Master Agreement ¶ 4(b).) Exhibit D is a detailed form hotel management agreement. (Master Agreement, Ex. D.) Similarly, with respect to construction management, the parties agreed to enter into an agreement "in substantially the form" of Exhibit F to the Master Agreement. (Master Agreement ¶ 4(a).) Exhibit F is a comprehensive form development agreement. (Master Agreement, Ex. F.) Paragraph 4 of the Master Agreement also provided that Defendants had the right to manage any office or retail portion of any Pipeline Property and to be "compensated for such management services at a market rate to be determined in accordance with the [Joint Venture] operating agreement." (Master Agreement ¶ 4.) The Court will refer to the various form agreements attached to the Master Agreement as the "implementing" agreements.

{30}   Inland's failure to give written notice at any of the required stages would constitute a rejection of the opportunity to develop the Pipeline Property with Plaintiff. (Compl. ¶ 13.) Upon Defendants' rejection of a development package, Defendants "agree[d] to transfer, convey and assign, any rights [they] ha[ve] in any such Pipeline Property to [Plaintiff] or its assignee, and to execute all documentation reasonably necessary to accomplish such transfer, upon payment by [Plaintiff] to [Defendants their] acquisition costs incurred to date for such rights." (Master Agreement ¶ 5.)

{31} If "at any point" Inland elected not to pursue a particular property, and if Crockett Capital elected to develop it alone or with a third party, Crockett Capital would be required under the Master Agreement to "reimburse Inland for those [P]ursuit [C]osts previously paid by Inland within ten days after the closing of the acquisition of the land or execution of the ground lease with respect to such property and in any event not later than the commencement of the construction." (Master Agreement ¶ 2.) If Crockett Capital failed to reimburse Inland for its Pursuit Costs within that ten (10) day period, the Master Agreement provided that Crockett Capital would incur interest on that debt. Inland was obligated to transfer its interests in the properties only "upon payment by [Crockett Capital] to Inland of its acquisition costs incurred to date for such rights." (Master Agreement ¶ 5.) The Master Agreement did not permit Inland to proceed alone with a Pipeline Property that Crockett wished to pursue. The Court will refer to the provisions governing rejection of a Pipeline Property by Defendants as the "impasse" provisions.

{32} Inland was further protected by contract provisions, which granted it another chance to accept a previously rejected development package if Plaintiff later made "material changes" to the package. (Master Agreement ¶ 5.) Crockett Capital was bound to notify Inland of any material changes in the terms of a Pipeline Project previously rejected by Inland. Paragraph 5 of the Master Agreement defined a material change in the terms of a Pipeline Project as:

> (i) a change in the hotel brand; (ii) a change of more than 10% in the number of rooms; (iii) a decrease of more than 7.5% of the total development cost estimate; or (iv) an increase of more than 7.5% in the Net Operating Income projected over the first three years of hotel operation.

(Master Agreement ¶ 5.)

{33} The Master Agreement, together with the extensive attachments constituting the implementing agreements, constituted a very sophisticated business transaction among parties of equal knowledge negotiating at arms length. As this Court noted in *JDH Capital, LLC v. Flowers*, 2009 NCBC 4 ¶ 18 (N.C.

Super. Ct. Mar. 13, 2009), real estate development requires sophisticated documentation. The extensive nature of the documentation in the Master Agreement and the implementing agreements left very few items to be negotiated for each site. In essence, the parties established working agreements to cover each aspect of a joint development once the decision was made to move forward with a particular property.

{34} The major term left undecided with respect to each Pipeline Property was the capital contributions to be made by each party. The capital contributions dictated the ownership in each Joint Venture, and, under the Master Agreement, the proposed equity percentages for each project would be known by the parties very early in the process. Each project would have its own capital structure to be negotiated among the parties. Crockett Capital was to submit its "preliminary proposed equity percentages" for each project with the submission of the "preliminary development packages," which were due within either thirty (30) days or sixty (60) days of the Master Agreement's execution. (Master Agreement ¶ 2.) It is possible that the percent ownership of each property could change after Crockett Capital's initial submission because Crockett Capital was required to update the proposed equity ownership percentages in its subsequent development packages. (Master Agreement ¶ 2.) Even so, the proposed equity percentages in the initial submissions created both risks and benefits to the parties. Once Inland elected to proceed with a project, it incurred an obligation to share the Pursuit Costs. Those costs would be paid "as incurred . . . in accordance with the proposed ownership percentages" then existing. (Master Agreement ¶ 2). Additionally, if both parties elected after Inland's initial approval to pass on a particular property, then both parties would be responsible for their own Pursuit Costs as determined by the proposed percent ownership in Crockett Capital's initial submission.

{35} The Master Agreement contained no language indicating that it was merely a letter of intent. These sophisticated parties elected not to use such language. They had executed a prior Memorandum of Understanding, and the Master Agreement provided the detailed final agreement.

## D.
## THE RTP WESTIN

{36}   One of Crockett Capital's breach of contract claims and some of Defendants' counterclaims relate to a transaction involving the RTP Westin, which occurred before the parties executed the Master Agreement.  The RTP Westin is one of the thirteen Pipeline Properties listed in the Master Agreement.  (Master Agreement, Ex. B)  As part of the acquisition of Winston Hotels, Inland acquired the right to develop this property.  (Master Agreement ¶ A.)

{37}   Since early 2007, Crockett had been working to acquire the RTP Westin site for Winston Hotels.  (Crockett Dep. at 300:7–11.)  In June 2007, Crockett was working to finalize the purchase contract for the RTP Westin site.  Gregory Sanchez, the seller's representative, had been in ongoing negotiations with Mr. Crockett to finalize the deal.  (Dep. of Gregory Sanchez ("Sanchez Dep.") at 32:10–23, 33:23–34:4, 35:19–36:20.)  Prior to his departure for a family vacation in June, Crockett left a signed copy of the purchase contract for the RTP Westin site with his secretary and instructed his attorney to release the signature page upon confirmation that Mr. Sanchez had obtained his clients' consent to the final terms.  (Sanchez Dep. at 38:3–39:17; Crockett Dep. at 300:1–304:2.)  Crockett signed the purchase contract in his capacity as an officer of Winston Hotels, which was the sole general partner of Winn LP at that time.  (Bunch Dep. at 82:25–83:1.)  Although the contract for the sale of the RTP Westin site had not been executed as of July 1, 2007 (the day Inland acquired all rights to Winston Hotels' assets), drafts, all of which named Winston Hotels or Winn LP as the purchaser, had been prepared and circulated.  (*Inland v. Winston*, Answer of Defs. Robert W. Winston, III, Kenneth R. Crockett, and Winston Hospitality, Inc. ("Westin Answer") ¶ 16; Crockett Dep. at 300:1–304:2; Bunch Dep. at 80–81.)

{38}   Mr. Sanchez began putting pressure on Mr. Crockett to execute the contract because Mr. Sanchez was under pressure to present it to the seller's investment committee contemporaneously with the lease for a proposed office building that would be adjacent to the RTP Westin.  (*Inland v. Winston*, Def.

William W. Bunch, III and Brown and Bunch, PLLC's Br. in Supp. of Mot. for Summ. J. ("Defs.' Summ. J. Br.") 5.) Mr. Sanchez gave Mr. Crockett an ultimatum: if the contract terms could not be imminently finalized, he would take the RTP Westin opportunity to another qualified hotel developer with whom he had a longstanding business relationship. (Sanchez Dep. at 53:17–58:11.)

{39}  With the merger between Inland and Winston Hotels concluded, neither Crockett nor Winston was an officer or an employee of the surviving entity. (Crockett Aff. ¶ 4; Aff. of Robert W. Winston, III ("Winston Aff.") ¶ 4.) Neither party had the authority to sign a contract on behalf of Winston Hotels or Inland. Yet, Crockett's involvement in procuring the RTP Westin project for the Joint Venture was essential for Inland and Crockett Capital to move forward with the business opportunity. Mr. Sanchez was under a deadline, and without Crockett's participation, he would have been inclined to recommend selling the property to another developer rather than to Inland, an organization lead by unknowns. (Sanchez Dep. at 69:25–70:17.)

{40}  Crockett had the contract for the RTP Westin site put in the name of Winston Hospitality, a Winston-Crockett entity that was not a party to the Master Agreement. (*Inland v. Winston*, Defs.' Summ. J. Br., Ex. 8: E-mail from Kenneth Crockett to William Bunch (July 11, 2007, 14:05 EDT); Bunch Dep. at 126:7–12, 131:1–7.) Crockett sent Mr. Bunch a contract signed by Winston on behalf of Winston Hospitality on July 12, 2007. (Bunch Dep. at 144:20–3; Tr. of Hr'g 97 (argued Sep. 23, 2010); *Inland v. Winston*, Compl. ¶ 21; Westin Answer ¶ 21.) It was executed by the seller on July 19, 2007. (*Inland v. Winston*, Compl. ¶ 21; Westin Answer ¶ 21.)

{41}  No one from Crockett Capital contacted Inland to inquire whether Inland was agreeable to Winston Hospitality being named the contract purchaser. (Winston Dep. at 178:9–179:23; Crockett Dep. at 316:6–319:9.)

{42}  Crockett explained the reason for the name change in a July 11, 2007 email to his attorney, which stated:

Bill: You will see that, in my discussions with Greg Sanchez, we have changed the purchasing entity to Winston Hospitality for signature by Bob Winston. The change is necessary to maintain momentum and timeliness in pursuit of this transaction. Among other things, Greg needs to present a signed contract for his investment committee tomorrow. *Bob and I fully intend to develop this property under the terms of our joint venture arrangement being negotiated with Inland.* The assignment provisions within the purchase agreement will allow us to form the [joint venture] with Inland without further approvals from seller. Ken.

(*Inland v. Winston*, Defs.' Summ. J. Br., Ex. 8: Email from Kenneth Crockett to William Bunch (July 11, 2007, 14:05 EDT) (emphasis added).)

{43} Crockett also told his attorney in July 2007 that it did not matter which entity ultimately entered into contracts and vendor relationships because he and Winston were pursuing deals for the Joint Venture and because the Master Agreement allowed Inland's Pursuit Costs to be "trued up." (Bunch Dep. at 22:20–23:6.) The goal was to get the property under contract, then proceed in accordance with the Joint Venture. (Bunch Dep. at 110:20–5.)

{44} As set forth in the Master Agreement and acknowledged by Inland's representative, John Brown, Mr. Crockett was to research and evaluate the Pipeline Properties. (Dep. of John Brown ("Brown Dep.") at 618:14–621:11.) He was to perform all predevelopment work with regard to the Pipeline Properties, including: conducting market studies; evaluating sites; negotiating land contracts (including the RTP Westin contract); and hiring vendors and lawyers. (Brown Dep. at 618–621.) He also had the authority to hire and to deal with architects and engineers for those properties. (Brown Dep. at 619:23–620:6.)

{45} Crockett's attorney understood that although Winston Hospitality was named in the contract to purchase the RTP Westin, Crockett and Winston intended to assign the contract rights to the Joint Venture with Inland and negotiated an assignment provision permitting them to do so. (*Inland v. Winston*, Defs.' Summ. J. Br. 7, Ex. 8.) Mr. Bunch made Petula Prolix Development Company, the seller of

the RTP Westin site, aware of this intent in a letter dated September 13, 2007. (*Inland v. Winston*, Defs.' Summ. J. Br., Ex. 11.) He explained that

> the proposed insured under the Title Commitment is WINN Limited Partnership . . . ("WINN"), whose sole general partner is [Inland] . . . , with WINN or a joint venture entity among WINN and Purchaser[, Winston Hospitality,] being the intended assignee of Purchaser as contemplated by Section 19 of the Contract.

(*Inland v. Winston*, Defs.' Summ. J. Br., Ex. 11.)

{46}    The Master Agreement was signed on July 30, 2007 and made retroactive to July 1, 2007. Thus, Inland ratified Crockett's actions taken on behalf of the Joint Venture during July 2007.

{47}    Inland has produced no evidence to challenge Crockett's stated intention with respect to the RTP Westin.

{48}    On August 21, 2007, Crockett Capital tendered to Inland a preliminary development package for the RTP Westin. (Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Summ. J. Br."), Ex. 24: Westin Hotel Investment Summary.) The proposal did not disclose that the contract purchaser for the property had been changed. (Winston Dep. at 195:25–196:12.) Winston stated in his deposition that he and Crockett "didn't believe it mattered" that the property was "parked in a holding company . . . that would hold it until [the parties] formed the joint venture entity." (Winston Dep. at 195:25–196:12.) Likewise, Crockett stated in his deposition that the identity of the contract purchaser "didn't really matter, as long as one of the parties could bring the title to the site, to the joint venture . . . ." (Crockett Dep. at 177:12–17.) Neither Crockett nor Winston disclosed to Inland in investment presentations or informal meetings that the site was under contract to Winston Hospitality. (Crockett Dep. at 331:23–332:2, 336:14–338:12.) Crockett Capital first informed Inland that the name of the contract purchaser had been changed in January 2008. (Defs.' Summ. J. Br. 10.)

{49}     After Crockett Capital submitted a preliminary development package for the site, Inland *verbally* approved the submission and expressed its desire to proceed with the development. (Defs.' Summ. J. Br. 10.) It also continued to fund

its share of the Pursuit Costs for the site. (Defs.' Summ. J. Br. 10.) Yet, Inland never provided *written* notice that it wished to continue the pursuit of the RTP Westin site, as required under the Master Agreement. (Pl.'s Summ. J. Br. 10.)

{50} Nearly three months after Crockett Capital submitted its "preliminary development" package for the RDU Aloft, on November 13, 2007, Crockett wrote to Inland by fax, email, and U.S. mail and requested Inland's position on the RTP Westin and other properties. (Crockett Aff. ¶ 16.) The next day, Mr. Brown from Inland telephoned Crockett to advise him that Inland would not permit Crockett Capital to manage either the RDU Aloft or the RTP Westin site. (Crockett Aff. ¶ 17.) He also indicated that Inland would not execute the operating agreement for the RDU Aloft or give him Inland's answers for the other three projects unless Crockett Capital gave up its right to manage the RDU Aloft and the RTP Westin. (Pl.'s Summ. J. Br. 10.)

{51} On November 21, 2007, Crockett asserted by letter that Crockett Capital no longer had an obligation to pursue the RTP Westin project with Inland, but that it would continue to follow the provisions of the Master Agreement. (Letter from Kenneth Crockett to John Brown (Nov. 21, 2007).) On December 11, 2007, Crockett wrote to Inland asking it to transfer its right, title, and interest in the RTP Westin site (among others) and to submit its Pursuit Costs. (Crockett Aff. ¶ 19.) Crockett Capital then offered to pay those Pursuit Costs. (Crockett Aff. ¶ 19.) Inland never conveyed its rights to the RTP Westin. (Pl.'s Summ. J. Br. 11.)

{52} Crockett Capital brought suit against Inland for breach of contract in January 2008. That same month, it informed Inland that the name of the contract purchaser for the RTP Westin was Winston Hospitality. (Defs.' Summ. J. Br. 10.) On Februaury 18, 2008, Crockett Capital submitted a second package for the RTP Westin, pursuant to its obligation under the Master Agreement to resubmit a project in the event of a material change in the terms previously rejected by Inland. (Pl.'s Summ. J. Br. 11.) Inland responded in writing that it wished to continue the potential development of the site, but it also indicated in those responses that it did not consider the Master Agreement to be a binding contract. (E-mail from John

Brown to Kenneth Crockett (Feb. 28, 2008); Letter from John Brown to Kenneth Crockett (Mar. 3, 2008); Letter from Tom McGuiness to Kenneth Crockett (Mar. 20, 2008).)

{53}  Ultimately, however, the RTP Westin site never was assigned to Inland. Instead, it was sold to a third party.  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp. Br.") 11.)

{54}  Crockett Capital has not reimbursed Inland for its pursuit costs incurred in connection with the RTP Westin site.  (Defs.' Summ. J. Br. 12.)

{55}  Inland claims that Crockett improperly authorized Winston Hospitality to be named the purchaser in the contract for the RTP Westin site rather than an entity controlled by Inland.  (Pl.'s Resp. Br. 1.)

E.

INITIAL PERFORMANCE UNDER THE MASTER AGREEMENT

{56}  After Crockett Capital was formed on July 11, 2007, it hired employees, leased office space, bought computers and equipment, and retained professionals. (Crockett Aff. ¶ 8.)

{57}  On July 12, 2007, Plaintiff presented a preliminary development package to Defendants for the Chapel Hill Aloft, one of the Pipeline Properties.  (Pl.'s Summ J. Br. 6; Master Agreement, Ex. B.)  On or about July 25, 2007, Defendants provided written notice of their desire to proceed toward the development of the Chapel Hill Aloft.  (Compl. ¶ 43; Answer ¶ 43.)

{58}  Crockett Capital submitted preliminary development packages for eight of the thirteen Pipeline Properties.  (Defs.' Summ. J. Br. 6.)  Three of the proposals were submitted within the time frame contemplated by the Master Agreement. (Defs.' Summ. J. Br. 6.)

{59}  Crockett proposed treating Crockett Capital's first development package for the RDU Aloft and a proposed Aloft in Birmingham, Alabama, as the final, stage three proposal.  (Crockett Aff. ¶ 12.)  Despite Defendants having problems with the compressed timeline for these developments (Broadfoot Dep. at 311:19–314:7), the

board of directors of Inland American approved the budget for the RDU Aloft proposal during a telephonic meeting on September 12, 2007. (Mins. of the Meeting of the Board of Directors of Inland American at 5.) On September 18, 2007, Defendants determined to participate in the Birmingham Aloft project. The parties agreed that Defendants would own a ninety-five (95) percent equity interest and Plaintiff would own a five (5) percent equity interest in both properties. (Compl. ¶ 49.) With respect to the Birmingham Aloft, Plaintiff and Defendants executed all the documents as required by the Master Agreement. (Compl. ¶ 49.) The parties used the Birmingham Aloft documents as a model for the RDU Aloft documents. (Compl. ¶ 50.)

{60} On or about September 28, 2007, in accordance with the Master Agreement, Plaintiff presented Defendants with a second development package for the Chapel Hill Aloft. (Compl. ¶ 43.) After this submission, Defendants did not provide notice that they wished to proceed further with development of the Chapel Hill Aloft. (Pl.'s Summ. J. Br. 34.) Plaintiff attempted to enforce Paragraph 5 of the Master Agreement, but Inland never conveyed its rights in the property or gave Plaintiff any assurances that it would abide by the Master Agreement. (Pl.'s Summ. J. Br. 34.) Instead, Defendants claimed the Master Agreement was unenforceable. (Pl.'s Summ. J. Br. 34.)

{61} Similarly, Plaintiff submitted a "preliminary development" package for a Hampton Inn & Suites/Aloft Hotel in Raleigh, North Carolina (the "Raleigh Hampton/Aloft"). (Compl. ¶ 45.) After receipt of the "preliminary development" package, Defendants failed to provide written notice that they wished to proceed with development of the Raleigh Hampton/Aloft. (Pl.'s Summ. J. Br. 34.) Plaintiff attempted to enforce Paragraph 5 of the Master Agreement, but Defendants never conveyed their rights in the property or gave Plaintiff any assurances that they would abide by the Master Agreement. (Pl.'s Summ. J. Br. 34.) Again, Defendants claimed the Master Agreement was unenforceable. (Pl.'s Summ. J. Br. 34.)

## F.
## RDU ALOFT

{62}   Winston Hotels purchased the site for the RDU Aloft in 2006.  (Pl.'s Summ. J. Br. 7.)  The hotel to be built on that site would be adjacent to an existing Winston Hotels Property, a Hilton Garden Inn.  (Pl.'s Summ. J. Br. 7.)  It was apparent to Crockett before the merger with Inland that the RDU Aloft would need more parking than its lot could accommodate.  (Crockett Aff. ¶ 30.)  He proposed obtaining the necessary parking from the Hilton Garden Inn.  He commissioned a study that concluded the parking rearrangement would pose no problem for the Hilton Garden Inn because it did not need the spaces that would be reallocated to the RDU Aloft.  (Crockett Aff. ¶ 30.)

{63}   In February 2007, Winston Hotels submitted to the Town of Cary a Site Plan Application and Major Site Plan Submittal that would have adjusted the property line between the two properties.  (Crockett Aff. ¶ 32.)  Later, Winston Hotels submitted a Site Plan that included an easement for the benefit of the RDU Aloft.  (Crockett Aff. ¶ 32.)  The Town of Cary approved the latter submittal in June 2007.  (Crockett Aff. ¶ 32.)

{64}   When the merger with Inland was complete on July 1, 2007, Inland or an affiliate succeeded to the ownership of the land that was burdened by the proposed easement, and, at that time, Defendants had access to Winston Hotels' documents describing the need for an easement to develop the RDU Aloft property.  (Brown Dep. at 508:2–514:5.)  Yet, during the merger talks and the negotiation of the Master Agreement, no one from Crockett Capital specifically told Inland of the need for an easement to develop the property.

{65}   Crockett Capital submitted a development package to Inland for the RDU Aloft on August 10, 2007.  (Defs.' Summ. J. Br. 12.)  Crockett requested that this initial submission be treated as a final submission to Inland, and Inland acquiesced.  (Crockett Dep. at 232:4–7.)  As a final submission, the package was to contain all necessary information Inland would need to determine whether to proceed with the project.  Winston stated that when making investment presentations to Inland, he

and Crockett "strive to present all of the factors that we know . . . to have an impact on the development of whether to develop the hotel." (Winston Dep. at 82:13–17.) He said:

> We presented to the best of our ability what we believe to be the facts relevant to that investment, just as we had done for the last 13 years for our board at Winston Hotels. We did this no differently. This was the same type of institutional presentation that we had relied on for our whole careers and that Winston Hotels is basically built on.

(Winston Dep. at 83:9–15.)

{66} Yet, the package Crockett Capital submitted to Inland did not identify the easement. (Pl.'s Summ. J. Br. 8.) "Crockett did not view the easement as an important fact to include in the investment package" because although the easement was a "piece in the development scheme," he believed "it would be a benefit to the Hilton, not a burden." (Pl.'s Summ. J. Br. 8.)

{67} When Inland's board conditionally authorized management to complete the RDU Aloft transaction, the directors understood that they were approving the budget for the project and not for the Joint Venture itself. (Mins. of the Meeting of the Bd. of Dir., Sept. 12, 2007 at 5.) The board would address the entire Joint Venture at a subsequent meeting. (Mins. of the Meeting of the Bd. of Dir., Sept. 12, 2007 at 5.) The board resolved that:

> subject to the Company entering into a definitive joint venture agreement by and between [Inland American] . . . and [Crockett Capital] on terms and conditions acceptable to the board in its sole discretion, the executive officers of the Company, or any of their designees, each of whom may act without joinder of any of the others, be and hereby are authorized to cause the Company to approve the development budget for the RDU aLoft [sic] Hotel which contemplates the joint venture funding a total development budget of approximately $21 million . . . .

(Mins. of the Meeting of the Bd. of Dir., Sept. 12, 2007 at 5.)

{68} In order to move forward with development, it became necessary to make a formal conveyance of the easement from the Hilton Garden Inn to the RDU Aloft.

In October 2007 Crockett broached the subject with Mr. Brown, an Inland executive. (Pl.'s Summ. J. Br. 8; Defs.' Summ. J. Br. 12.)

{69} After that disclosure, Inland viewed the easement as a detriment to its investment in the Hilton Garden Inn, and it never agreed to grant it to the RDU Aloft property. (Defs.' Summ. J. Br. 13–14.) After Inland learned of the need for the easement to develop the RDU Aloft property, negotiations between the parties concerning the Joint Venture for the project broke down. (Defs.' Summ. J. Br. 13–14.)

## G.
### BRENT WEST

{70} At the time of the merger, Winston and Crockett entered into a non-compete agreement in which they agreed, *inter alia*, not to directly or indirectly "solicit, recruit, or induce for employment (or assist or encourage any other person or entity to solicit, recruit, or induce for employment)" any employee of Winston Hotels to work for Winston and Crockett or to terminate their employment with Winston Hotels' successor. (Defs.' Summ. J. Br., Ex. 37, 38: Winston and Crockett Agreement Not to Compete ¶ 1(b).) The agreements provided an exception if Winston and Crockett obtained Inland's express written consent. (Defs.' Summ. J. Br., Ex. 37, 38: Winston and Crockett Agreement Not to Compete ¶ 2.)

{71} For a number of years before the merger, Mr. West was the Chief Accounting Officer at Winston Hotels under Crockett and Winston. (Counterclaim ¶ 6; Reply to Counterclaim¶ 6.) After the merger, Mr. West continued in the employ of Inland as its Chief Financial Officer and its senior officer in North Carolina. (Defs.' Summ. J. Br. 15.)

{72} In mid to late August 2007, Mr. West and Winston had a conversations about Winston hiring him back. (Aff. of Brent West ("West Aff.") ¶¶ 9, 10, 14, 16.) On August 29, 2007, Mr. West resigned his employment with Inland. (West Aff. ¶ 11.) He worked a two-week notice until September 14, 2007. (Defs.' Summ. J. Br. 16; Counterclaim ¶ 6; Reply to Counterclaim¶ 6.) Having previously accepted an

offer to do so, Mr. West joined his former superiors and became the Chief Financial Officer at Crockett Capital and Winston Hospitality. (Counterclaim ¶ 6; Reply to Counterclaim¶ 6.) He began work for Crockett Capital and Winston Hospitality on September 17, 2007. (West Aff. ¶ 21.)

{73} Neither Mr. Winston nor Mr. Crockett obtained written consent from Inland to hire Mr. West.

{74} Inland American filed suit in Wake County Superior Court against Winston and Crockett alleging a violation of their respective non-compete agreements relating to Mr. West's hiring. (Defs.' Summ. J. Br. 16.; *See* No. 08-CVS-003995 (N.C. Super. Ct.) The parties filed cross-motions for summary judgment. The Honorable Donald Stephens entered an Order on February 1, 2010, granting Winston and Crockett's summary judgment motion and denying Inland American's motion. The case is currently on appeal.

H.

CLAIMS

{75} Crockett Capital seeks partial summary judgment on its breach of contract claims and summary judgment on all Counts of Inland's counterclaim. (Pl.'s Mot. for Summ. J. 1–2.) It also seeks an award of attorney fees based on Defendants' unfair and deceptive trade practices claim. In its counterclaim, Inland seeks: a declaratory judgment that the Master Agreement is not a binding contract, an alternative claim for rescission of the Master Agreement based on actual or constructive fraud in the inducement, an alternative claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1, an alternative claim for a declaratory judgment that Crockett Capital materially breached the Master Agreement, an alternative claim for rescission of the RDU Aloft approval based on actual or constructive fraud, negligent misrepresentation with respect to the RDU Aloft, interference with prospective economic advantage, breach of contract with respect to the Pursuit Costs for the RTP Westin and unjust enrichment with respect to the Pursuit Costs for the RTP Westin.

{76}   Defendants Inland and Winn Limited Partnership seek summary judgment on all claims asserted by Plaintiff in its Second Amended Complaint: breach of contract relating to the RDU Aloft property; breach of contract relating to the RTP Westin, Raleigh Hampton/Aloft and Chapel Hill Aloft Properties; and violation of the North Carolina Unfair and Deceptive Trade Practices Act. (Defs.' Mot. for Summ. J. 2.) Additionally, Defendants seek summary judgment on their counterclaims concerning the RTP Westin and the RDU Aloft. (*See* Defs.' Mem. of Law in Opp'n to Mot. for Summ. J. Filed by Plaintiff Crockett Capital Corp. ("Defs.' Resp. Br.") 2–19.)

### III.
### LEGAL STANDARD

{77}   Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). The burden of showing a lack of triable issues of fact falls upon the moving party. *See e.g. Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985).

> The party moving for summary judgment bears the burden of establishing that there is no triable issue of material fact. This burden may be met by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim. Once the moving party satisfies these tests, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a prima facie case at trial. The trial judge must consider all the presented evidence in a light most favorable to the nonmoving party, and all inferences of fact must be drawn against the movant and in favor of the nonmovant[.] In addition, because summary judgment is a somewhat drastic remedy, it must be used with due regard to its purposes and a cautious observance of its requirements in order that no person shall be deprived of a trial on a genuine disputed factual issue.

*DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681–82, 565 S.E.2d 140, 146 (2002) (internal quotations and citations removed.) The party opposing the motion "must come forward with specific facts (not mere allegations or speculation) that controvert the facts set forth in the movant's evidentiary forecast." *Johnson v. Scott*, 137 N.C. App. 534, 537, 528 S.E.2d 402, 404 (2000).

IV.

ANALYSIS

A.

THE MASTER AGREEMENT

{78}   In this Court's previous Order Denying Inland's Motion to Dismiss and in a case decided the same day at the summary judgment phase, this Court set forth criteria for determining the enforceability of contracts that contemplate future agreements. *See Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc.* 2009 NCBC 5 (N.C. Super. Ct. Mar. 13, 2009); *JDH Capital*, 2009 NCBC 4. In those opinions, the Court considered the following: (1) whether the language of the document states that it is non-binding or otherwise demonstrates an intent not to be bound; (2) whether the document omits material terms still to be negotiated; (3) whether a certain remedy applies in the event the negotiation fails, even if there are material terms to be negotiated; (4) whether the parties are sophisticated; (5) and whether the conduct of the parties before and after the execution of the document indicates that it is binding. *See Crockett Capital*, 2009 NCBC 5, ¶¶ 28–34.; *JDH Capital*, 2009 NCBC 4, ¶¶ 26–41.

{79}   Unsurprisingly, the parties in this action have taken two divergent views concerning the proper interpretation and enforcement of the Master Agreement. (*Cf.* Defs.' Resp. Br. 4–8 *with* Pl.'s Summ. J. Br. 29–34.) It is undisputed that the language of the Master Agreement does not state or suggest that it is non-binding. In fact, the negotiation and execution of the Master Agreement followed the parties' negotiation of a non-binding Memorandum of Understanding that set out the major

terms of the deal and the parties' intentions. (McAuley Dep. at 40:20–41:3.) Had the parties wished to indicate the non-binding nature of the Master Agreement, they would have done so.

{80} Defendants argue that the Master Agreement leaves material terms open for future agreement, provides no remedy should certain circumstances arise in negotiating future agreements, and provides no means to settle unresolved disputes concerning certain terms of the agreement. (Defs.' Resp. Br. 4–6 (citing *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974); *Housing, Inc. v. Weaver*, 305 N.C. 428, 290 S.E.2d 642 (1982); *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC 3 (N.C. Super. Ct. Apr. 28, 2003)).) Plaintiff argues that the Master Agreement is itself an enforceable contract. (Pl.'s Summ. J. Br. 26–32.)

{81} North Carolina courts have been reluctant to enforce contracts that require the Court to supply material terms not specified in the parties' agreement. *See Chappell v. Roth*, 353 N.C. 690, 692, 548 S.E.2d 499, 500 (2001) (finding that a document that merely expresses the intent and desires of the parties, rather than their agreement, and which leaves no means to settle the unresolved terms, is not enforceable as a contract); *Housing, Inc. v. Weaver*, 305 N.C. 428, 444, 290 S.E.2d 642, 652 (1982) (finding that a document, which failed to specify the form of ownership of the subject project, was not enforceable); *Boyce v. McMahan*, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) ("'If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.'" (quoting *Croom v. Goldsboro Lumber Co.*, 182 N.C. 217, 220, 108 S.E. 735, 737 (1921))); *N.C. Nat'l Bank v. Wallens*, 26 N.C. App. 580, 584, 217 S.E.2d 12, 15 (1975) ("Generally, a contract, or an offer to contract, which leaves material portions open for future negotiations is nugatory and void for indefiniteness." (citing *Boyce v. McMahan*, 22 N.C. App. 254, 206 S.E.2d 496, *aff'd*, 285 N.C. 730, 208 S.E.2d 692 (1974))). The North Carolina Supreme Court stated in *Boyce* that a contract to enter into a future contract must specify all its material terms and essential terms, and leave none to be agreed upon as a result of future negotiations." 285 N.C. at

734, 208 S.E.2d at 695. In *JDH Capital*, this Court declined to find an enforceable agreement. At the summary judgment stage, the Court could determine that the relief sought could not be obtained without the Court having to supply material terms. *See* 2009 NCBC 4 ¶¶ 28–37.

{82} Yet, North Carolina courts do enforce preliminary binding agreements where some material terms setting the *ultimate* relationship between the parties are left to be negotiated. In a recent case, the Court of Appeals affirmed the trial court's enforcement of a forum selection clause in a Master Agreement. *See Sony Ericsson Mobile Commc'n USA, Inc. v. Agere Sys., Inc.*, 195 N.C. App. 577, 672 S.E.2d 763 (2009). In *Sony Ericsson*, the parties incorporated a forum selection provision in a Master Agreement (the "MDLA") which contemplated that the parties would enter into future agreements to be governed by a Statement of Work (the "SOW"). *Id.* at 578, 672 S.E.2d at 765. The Court of Appeals stated:

> The MDLA sets out the ground rules for the parties to negotiate possible SOWs and articulates agreed-upon procedures, practices, and terms applicable to SOWs the parties might execute in the future. As the trial court stated in its order, "the main purpose of the MDLA is to provide 'the general terms and conditions under which' the parties would explore a further relationship . . . the MDLA does not require that a Statement of Work ever be executed."
>
> Plaintiff argues that the MDLA contains numerous material terms that are not resolved, and thus does not represent an enforceable agreement. However, Plaintiff does not cite provisions or terms of the MDLA itself, but only terms of possible SOWs. Plaintiff fails to articulate how open terms in a hypothetical future SOW would make the terms of the MDLA itself unenforceable. We again quote from the trial court's order:
>
> "Though the MDLA may not contain many of the substantive terms of the contemplated ultimate relationship of the parties itself— which appears to be the provision of technological deliverables—none of its own terms remain to be negotiated. . . .
>
> [T]he majority of the MDLA's provisions pertain directly to Statements of Work, should any have been entered. Sony USA argues that this demonstrates that the MDLA's effect depends on a Statement of Work. However, such dormant provisions neither demonstrate a lack of assent to the MDLA's terms nor otherwise provide grounds upon which to negate those provisions of the MDLA that do not pertain directly to Statements of Work, such as the Forum Selection Clause[.]"

*Id. at* 581–82, 672 S.E.2d at 767.

{83}   This case is similar to *Sony Ericsson*.  The Master Agreement and the form implementation agreements attached thereto as exhibits were thoroughly negotiated by the parties, and they were comprehensive.  The provisions in Exhibit E were complex and were drafted to comply with relevant tax laws and REIT regulations.  The only four items left to decide once the parties agreed to pursue a property together were:  (1) the name of the LLC, (2) the effective date of the agreement, (3) the date the Certificate of the LLC was filed, and (4) each party's percentage interest.  Each party's ownership interest in each property was the only material item to decide.  Under the Master Agreement, this percentage would be set after Crockett Capital's first submission to Inland, though the relative interests could be changed with subsequent submissions.  Once Inland made a final decision to accept the terms in Crockett Capital's final package, it was bound to execute an operating agreement in substantially the same form as Exhibit E to the Master Agreement.

{84}   Through the impasse provisions contained in Paragraph 5, the Master Agreement contemplated and specified certain remedies should Inland choose not to proceed with Crockett Capital on a property.  Inland would be protected by: (1) reimbursement for its costs of acquisition, and (2) a second chance to reconsider participation if material terms of the proposed project were to change.  Unlike in *JDH Capital*, where the Court was asked to supply terms missing from a written letter of intent, this case involves the enforcement of specific remedies provided for in the agreement itself.  The impasse provisions apply when the parties are unable to agree on the narrow range of issues left open with respect to each Pipeline Property.  Absent the impasse provisions in this agreement, the lack of agreement on such key terms as capital contribution would pose a significant barrier to judicial enforcement.

{85}   The Master Agreement recognized that Inland might choose not to participate in a Joint Venture for a particular Pipeline Property.  That choice was a

recognized component of the contract. Inland could have contracted to keep its options on the Pipeline Property and reimburse Crockett Capital for its development costs. It did just the opposite. Inland protected itself by providing for receipt of any acquisition costs of the option on the Pipeline Property, as well as any project development costs it had incurred. Inland was also protected against Crockett Capital changing the development plan for the project in a material way without Inland having the opportunity to revisit its decision not to participate. The Court finds that the impasse provisions are complete and do not require supplementation. The Court does not need to supply any material terms to enforce the parties' intentions.

{86} Additionally, the Court of Appeals noted in *Sony Ericsson* that the parties were sophisticated businesses who could have provided in the Master Agreement that enforcement of the forum selection clause could only occur if a SOW was executed. *Id.* at 583, 672 S.E.2d at 687. The sophisticated parties to this Master Agreement could have placed limitations on the impasse provisions, but they did not do so. These were sophisticated parties drafting sophisticated documents. They did not use language indicating the absence of material agreements in the Master Agreement.

{87} Finally, the actions of the parties both before and after they executed the Master Agreement demonstrate that the document is enforceable. The parties began their Joint Venture by negotiating a non-binding five-page Memorandum of Understanding that was completed no later than June 7, 2007. (Pl.'s Summ. J. Br. 30.) They then spent more than six weeks converting their understanding into the specific provisions of the Master Agreement and its exhibits, a 156-page document. (Pl.'s Summ. J. Br. 30.) The exhibits contained the fees for developing and managing the hotels and a complex formula for distributing the profits of each Joint Venture, which was "heavily negotiated." (Pl.'s Summ. J. Br. 30.) Mr. McGuiness and Mr. Broadfoot, Inland executives, agreed that by July 30, 2007, the "relevant business points of the deal, many of which were contained in the exhibits, were baked, done, negotiated." (Pl.'s Summ. J. Br. 30 (internal quotations removed).)

{88} After the parties executed the Master Agreement, Inland acted as if the document controlled its rights and duties with respect to the Birmingham Aloft and the RDU Aloft. When Inland accepted Crockett Capital's proposal for the Birmingham Aloft, it selected an ownership interest consistent with the terms of the Master Agreement, and it executed agreements identical in all material respects to the implementation provisions in the Master Agreement. (McGuiness Dep. 64:13–65:7.) When Inland approved the RDU Aloft project, Mr. Broadfoot instructed counsel for the Joint Venture to draw up documents using the Birmingham forms. (E-mail from Michael Broadfoot to Andy Tapscott (Sept. 26, 2007, 12:22 p.m.).)

{89} Inland first indicated its concerns about the enforceability of the Master Agreement in December 2007, nearly five months after the execution of the agreement, and after it had operated under the provisions of the agreement and the implementation provisions.

{90} The Master Agreement is an enforceable contract. Each party had a duty to act in good faith and deal fairly with the other. There is evidence of record, if believed by a jury, that would indicate Defendants failed to comply with that obligation. Crockett Capital's Motion for Summary Judgment on Defendants' counterclaim Count I: Declaratory Judgment on the Enforceability of the Master Agreement is hereby GRANTED.

B.

CLAIMS RELATED TO THE RTP WESTIN

1.

Inland's Alleged Breach of the Master Agreement
With Respect to the RTP Westin

{91} Crockett Capital alleges that Inland breached the Master Agreement with respect to the RTP Westin by failing to transfer its right, title, and interest in the property after it failed to provide Crockett Capital with written notice of its intention to develop the property in a Joint Venture within the required ten (10)

day time period, and it seeks summary judgment on that claim. (Pl.'s Summ. J. Br. 34.) Inland also seeks summary judgment on the claim. (Defs.' Summ. J. Br. 22–25.)

{92} Crockett Capital submitted its only package for the RTP Westin in August 2007. (Pl.'s Summ. J. Br. 34.) If Inland wished to proceed in a Joint Venture, it was required to respond in writing within (10) ten days. Inland did not so respond. (Pl.'s Summ. J. Br. 34.) Instead, on November 14, 2007, Mr. Brown advised Crockett that Inland would not indicate whether it would proceed with a Joint Venture unless Crockett Capital agreed to give up its right to manage the hotel.

{93} The Master Agreement states that if Inland determines not to develop a Pipeline Property in a Joint Venture with Crockett Capital, it

> agrees to transfer, convey, and assign, any rights it has in any such Pipeline Property to [Crockett Capital] or its assignee, and to execute all documentation reasonably necessary to accomplish such transfer, upon payment by Crockett Capital to Inland of its acquisition costs incurred to date for such rights.

(Master Agreement ¶ 5.) On December 11, 2007, Crockett Capital requested that Inland convey its rights in the property, and it offered to pay the Pursuit Costs Inland incurred for the property. (Pl.'s Summ. J. Br. 34.) Crockett stated that it would reimburse Inland's Pursuit Costs incurred to date on the project "upon commencement of construction." (Memorandum from Kenneth Crockett to Inland (Dec. 11, 2007) at 3.) Under Paragraph 2 of the Master Agreement, Crockett Capital may have the right to delay payment until the commencement of construction. Even if it does, however, Inland has no duty to transfer its rights until Crockett Capital first pays Inland its Pursuit Costs. Because Crockett Capital has not tendered to Inland its Pursuit Costs with respect to the RTP Westin as required under the Master Agreement, Inland's duty to transfer its rights in the property has not yet arisen. *See Winders v. Kenan*, 161 N.C. 628, 689–90 (1913).

{94} Additionally, in order for Crockett Capital to prevail on a claim for breach of contract, it "must show that the alleged breach caused him injury." *Ausley v. Bishop*, 133 N.C. App. 210, 219, 515 S.E.2d 72, 79 (1999). As discussed above,

Winston Hospitality was the contract purchaser for the RTP Westin. So, Crockett and Winston already owned the property. Crockett stated that Crockett Capital "needed [Inland] to assign . . . the rights they had in the design of the project, the rights they had to governmental approvals and entitlements to the project" and the franchise license for the project. (Crockett Dep. at 64:17–25.)

{95} In his deposition, Crockett acknowledged that the RTP Westin development proceeded without the assignment of Inland's interests in the property. Crockett testified that Crockett Capital continued to use the design work and the civil engineering work for the project with potential investors, and that no investors refused to participate in the project even though Inland failed to assign the franchise right. (Crockett Dep. at 69:14–73:14, 77:22–79:8.) Also, Crockett could not recall any governmental approvals that needed to be assigned. (Crockett Dep. at 72:15–76:8.) Crockett Capital and/or Winston Hospitality obtained a franchise approval from Starwood for the RTP Westin in early 2008. (Crockett Dep., May 17, 2010, at 17:7–18:2.) Finally, according to Winston, by the late summer or early fall of 2008, Crockett Capital and/or Winston Hospitality had obtained the debt and equity commitments necessary to proceed with the construction of the RTP Westin. (Winston Dep. at 224:19–225:22.) Yet they chose not to proceed with the development at that time. Winston stated that in October 2008, there was "uncertainty in the market. We felt like it was better to wait and that's what we've done." (Winston Dep. at 224:19–225:22.) Winston Hospitality now has an agreement with a Quintiles affiliate to be their development partner for the RTP Westin site. (Winston Dep. at 224:19–225:22.)

{96} Crockett Capital and/or Winston Hospitality proceeded to develop the RTP Westin property as though they already had all necessary rights from Inland as required under the Master Agreement. The Crockett/Winston entities elected not to proceed with the project because the market conditions disfavored the development of a new hotel. Crockett Capital has projected no evidence that Inland's alleged breach with respect to the RTP Westin actually caused it any damages.

{97}   To date, Crockett Capital has not paid Inland the Pursuit Costs incurred with respect to the RTP Westin, and it has failed to forecast evidence of damages caused by Inland's failure to transfer its remaining rights in the RTP Westin property.  Thus, Crockett Capital's Motion for Summary Judgment on its Second Claim for Relief for Breach of Contract Relating to the RTP Westin is hereby DENIED.  Defendants' Motion for Summary Judgment on Crockett Capital's Second Claim for Relief for Breach of Contract Relating to the RTP Westin is hereby GRANTED.

2.

Crockett Capital's Alleged Fraudulent Inducement
With Respect to the RTP Westin

{98}   Inland claims that even if the Master Agreement is an enforceable contract, it is entitled to rescind the agreement and/or is relieved from its duty to perform under it because Crockett Capital fraudulently induced Inland into entering into the Master Agreement by its actions related to the RTP Westin, the RDU Aloft, and the hiring of Brent West.  (Counterclaim ¶ 53.)  In this section, the Court will cover the facts surrounding the RTP Westin.[1]

{99}   Crockett Capital seeks summary judgment on Inland's counterclaim for fraudulent inducement based on actual and constructive fraud.  "In order to obtain relief from a contract on the ground of [actual] fraud, the moving party must show false representation of a past or subsisting material fact, made with fraudulent intent and with knowledge of its falsity, which representation was relied upon when the party executed the instrument."  *In re Estate of Loftin*, 285 N.C. 717, 722, 208 S.E.2d 670, 674 (1974).  "To withstand a motion for summary judgment on a fraud claim, the forecast of the evidence must present a genuine issue of material fact as to each element of fraud.  Summary judgment is proper where the forecast of

---

[1] For a discussion on the fraudulent inducement claim related to the RDU Aloft, *see* Sec. IV(C)(2), *infra*.  For a discussion on the fraudulent inducement claim related to the hiring of Brent West, *see* Sec. IV(D), *infra*.

evidence shows that even one of the essential elements of fraud is missing." *Bolton Corp. v. T.A. Loving Co.*, 94 N.C. App. 392, 409, 380 S.E.2d 796, 807 (1989) (internal citations and quotations omitted). Here, Inland fails to forecast evidence of two essential elements.

{100} While in most transactions involving real property the name of the contract purchaser is a material fact for the purposes of an actual fraud claim, here, as between Inland and Crockett Capital, the name of the purchaser of the RTP Westin was not material. By having the purchase contract for the RTP Westin put in the name of Winston Hospitality, Crockett preserved the opportunity for Inland and Crockett Capital to develop the project together. Though the Master Agreement had not yet been executed, Crockett was acting for the Joint Venture as if it had been. Making the Master Agreement retroactive to July 1, 2007 ratified Crockett's conduct on behalf of the Joint Venture to be formed to develop the project.

{101} In July 2007, a Winston/Crockett entity had control of the site. If Inland chose to participate in the project, it would have a duty to proceed under the Master Agreement. If it chose not to proceed, it would have the obligation to convey any of its rights that it had in the property. Had Inland or WINN been the contract purchaser, and had it chosen not to develop the property, Inland would have to convey its ownership interest in the property to Crockett Capital (assuming that Crockett Capital wished to develop it). The name on the sales contract only mattered if neither party wished to develop the property or if Inland wished to develop it on its own after Crockett Capital passed on the opportunity. That was not the case with respect to the RTP Westin, which Crockett Capital always intended to develop.

{102} Additionally, Inland has failed to forecast evidence that Crockett and Winston changed the name on the sales contract with intent to deceive Inland. The undisputed facts reveal that Crockett and Winston were responsible for pursuing the Pipeline Properties under the Master Agreement. Mr. Sanchez, the seller's agent, required a quick execution of the contract, and he counted on Crockett and

Winston's participation in the project. Neither Winston nor Crockett had any authority to sign the contract on behalf of Inland. Crockett put the property in the name of an entity that he and Winston controlled, and he negotiated language with Mr. Sanchez that would allow assignment of the contract to a Joint Venture without seller approval. Inland executive Mr. Broadfoot stated that with respect to the RTP Westin, the Crockett team was "following the spirit of the [Master] agreement." (Broadfoot Dep. 237:12–18.)

{103} After the Master Agreement was executed, Crockett Capital submitted two investment packages to Inland expressing its interest to own and operate the RTP Westin with Inland. It is true that Crockett Capital did not disclose that the contract purchaser had been changed. But, if the parties had followed the Master Agreement's provisions, the name of the contract purchaser would not have affected the ownership outcome. Inland would have owned between eighty (80) and ninety-five (95) percent of the property, or if it had declined to participate, it would have owned none of it.

{104} "A claim of constructive fraud does not require the same rigorous adherence to elements as actual fraud. Rather, this cause of action arises where a confidential or fiduciary relationship exists, which has led up to and surrounded the consummation of the transaction in which a [party] is alleged to have taken advantage of his position of trust to the hurt of the [claimant]." *Forbis v. Neal*, 361 N.C. 519, 528, 649 S.E.2d 382, 388 (2007) (internal citations omitted). To state a claim for constructive fraud, the claimant must "establish (1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction." *Marketplace Antique Mall, Inc. v. Lewis*, 163 N.C. App. 596, 599, 594 S.E.2d 121, 124 (2004).

{105} At the time Crockett had the name of the contract purchaser changed, Inland and Crockett Capital had not executed the Master Agreement. The Master Agreement was signed at the end of July, at which time, the parties obtained the

rights and incurred duties specified in the contract.  Each party would not become a fiduciary of the other with respect to a particular Pipeline Property until they executed the implementing documents required to create a Joint Venture for that site.  Crockett Capital did not submit a preliminary development package for the RTP Westin until August 21, 2007.  It did not submit a second proposal until February 2008.  The parties never formed a Joint Venture for the RTP Westin.  Thus, they are not fiduciaries with respect to the RTP Westin project.  Additionally, changing the name of the contract purchaser would not have caused harm to Inland had the parties proceeded under the terms of the Master Agreement.  Inland cannot support a claim for constructive fraud related to the property.

{106} Inland cannot demonstrate actual or constructive fraud based on Crockett Capital's actions with respect to the RTP Westin property.  Crockett Capital's Motion for Summary Judgment with respect to Defendants' counterclaim Alternative Count II(A): Fraud (Actual or Constructive) and Rescission of the Master Agreement for Crockett Capital's failing to disclose that it caused the name of the purchaser of the RTP Westin to be changed to Winston Hospitality is hereby GRANTED.

3.

Crockett Capital's Alleged Intentional Interference
With Prospective Economic Advantage

{107} Inland alleges that Crockett Capital acted with intent to interfere with Inland's expectancy that it would be the buyer of the RTP Westin and that it had a realistic expectation of future profit from the acquisition and development of the property.  (Counterclaim ¶¶ 89–90.)  Crockett Capital seeks summary judgment on this claim.

{108} "[I]nterference with a man's business, trade or occupation by maliciously inducing a person not to enter a contract with a third person, which he would have entered into but for the interference, is actionable if damage proximately ensues."
*Dalton v. Camp*, 353 N.C. 647, 654, 548 S.E.2d 704, 709 (2001).  Crockett Capital

did not so interfere with Inland's business. As noted above, Crockett acted within the spirit of the then unexecuted Master Agreement in order to preserve the RTP Westin opportunity for the Joint Venture that was to be formed for the property. Had the parties acted in accordance with the terms of the Master Agreement, they could have developed the property together. Crockett offered Inland two opportunities to participate in owning the property under the terms of the Master Agreement. Inland has forecasted no evidence to suggest that Crockett had a malicious intent to interfere with Inland's business opportunity.

{109} Crockett Capital's Motion for Summary Judgment with respect to Defendants' counterclaim Alternative Count VII: Interference with Prospective Economic Advantage is hereby GRANTED.


4.

Crockett Capital's Alleged Breach of the Master Agreement
With Respect to the RTP Westin

{110} In its counterclaim, Inland alleges breach of contract with respect to Crockett Capital's failing to advise Inland that it was causing the identification of the contract purchaser of the RTP Westin to be changed to Winston Hospitality, its submitting a preliminary development proposal for the RTP Westin that was materially misleading by its failure to identify the contract purchaser, and its failure to pay Inland its RTP Westin Pursuit Costs. (Counterclaim Count IV(B), Count IV(C), Count VIII.) Inland also alleges unjust enrichment with respect to Crockett Capital's failure to pay its RTP Westin Pursuit Costs. (Counterclaim Count IX.)

{111} As noted above, whether a Winston/Crockett entity or Inland owned a particular Pipeline Property was not material, as long as the parties proceeded under the terms of the Master Agreement, and as long as Crockett Capital wished to pursue the property. If Inland chose to participate in the project, it would have a duty to proceed under the Master Agreement. If it chose not to proceed, under the impasse provisions, it would have an obligation to convey any of its rights that it

had in the property to Crockett Capital (assuming Crockett Capital wished to proceed alone or with a third party).

{112} Crockett acted to preserve the development opportunity for Inland and Crockett Capital. Crockett Capital did not breach the Master Agreement with respect to the RTP Westin. Crockett Capital's Motion for Summary Judgment with respect to Defendants' counterclaim Alternative Count IV(B) and IV(C) is hereby GRANTED.

{113} There is no dispute that Crockett Capital failed to fund the Pursuit Costs Inland incurred related to the RTP Westin. Crockett Capital argues that its obligation to fund these Pursuit Costs is excused by Defendants' material breach of the Master Agreement. As the Court finds above that Defendants did not breach the Master Agreement in connection with the RTP Westin, Crockett Capital has not demonstrated that it is excused from reimbursing the Pursuit Costs Defendants might demonstrate at trial. Crockett Capital's Motion for Summary Judgment with respect to Defendants' counterclaim Alternative Count VIII: Breach of Contract – RTP Westin Pursuit Costs and Alternative Count IX: Unjust Enrichment – RTP Westin Pursuit Costs is hereby DENIED.

C.

CLAIMS RELATED TO THE RDU ALOFT

1.

Inland's Alleged Breach of the Master Agreement
With Respect to the RDU Aloft

{114} Crockett Capital seeks summary judgment on its First Claim for Relief: Breach of Contract Relating to the RDU Aloft Property. (Pl.'s Resp. Br. 21; Pl.'s Summ. J. Br. 33.) Inland also seeks summary judgment on this claim. (Defs.' Summ J. Br. 21–22.) Crockett Capital argues that Inland breached the Master Agreement by its failure to execute an operating agreement with Crockett Capital for the property, and that Inland held back the easement required to develop the

property as "raw pretext, contrived when Inland's first efforts to abrogate the [Master] Agreement failed." (Pl.'s Resp. Br. 21; Pl.'s Summ. J. Br. 33.)

{115} "The essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds." *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980). Inland has a duty to convey the easement to Crockett Capital without any additional compensation only if the Master Agreement, as originally negotiated between April and July 2007, contemplates the easement's automatic transfer from Inland or its affiliate (owner of the Hilton Garden Inn after the June 2007 merger) to either a Joint Venture with Crockett Capital and Inland, or to Crockett Capital alone. As noted above, the Master Agreement was intended to include the material components of a joint development once the decision was made to move forward with a particular property. The only material item left open for negotiation was the division of each party's capital contribution to each Pipeline Property. The inclusion of the impasse provisions obviates the need for the Court to supply missing terms to enforce the agreement, and their inclusion indicates that the parties considered and agreed on those terms. The parties made a conscious decision to leave open their respective capital contribution obligation for each Pipeline Property.

{116} Plaintiff would have the Court hold that the transfer of the easement was part of the Master Agreement. These were sophisticated parties. Where agreements are "negotiated by sophisticated and well-counseled parties, courts are extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include, and courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Sony Ericsson*, 195 N.C. App. at 582, 672 S.E.2d at 767.

{117} The Master Agreement and the implementation provisions do not mention that the Hilton Garden Inn would be burdened by an easement for the benefit the RDU Aloft. If the parties nonetheless envisioned the grant of the easement when they negotiated the Master Agreement, they failed to include in its terms a property

right with significant value. Mr. Mark Woodworth, Inland's expert, concluded that the value of the easement to the owner of the Hilton Garden Inn was $1.9 million. (Report of R. Mark Woodworth, March 5, 2010 at 6.) That number represents the present value of the difference in profits that the owner of the Hilton Garden Inn would earn if it did not grant the easement as compared to the profits it would earn if it granted the easement. (Dep. of R. Mark Woodworth at 195.) Crockett Capital insists that the value of the easement in September 2007 was zero, because the Master Agreement required Inland to transfer "any" rights it had in the project if it opted to pass on the opportunity to develop it with Crockett Capital, and the rights it had at that time included the easement. (Pl.'s Reply Br. 12 n.7.) The granting of the easement would allow the RDU Aloft to be built as envisioned. If the easement went un-granted, the property would not have sufficient parking for the hotel design. Whatever the value of the easement actually is to the Hilton Garden Inn, it is not zero.

{118} In order for the Court to conclude that Inland breached its obligation to execute the documents necessary to proceed in a Joint Venture for the RDU Aloft, it would have to conclude that the Master Agreement required it to transfer the easement to Crockett Capital for free. Regardless of whether Inland executives knew of the need for the easement before the Master Agreement was executed (which is disputed), the terms of the Master Agreement itself do not suggest that the parties' minds ever met on that term. On September 12, 2007, Inland's board conditionally authorized management to complete the RDU Aloft transaction. There is a dispute about whether Inland had knowledge of the need for the easement at the time of the board's approval. Yet, there is no dispute that Crockett Capital's investment presentation to Inland's board made no mention of the need for the easement, even though Winston and Crockett were treating their presentations to Inland as if they were presentations to the board of directors at Winston Hotels before the merger. If the easement terms had been part of the parties' bargain when they negotiated the Master Agreement, the topic likely would have been discussed by the parties during that presentation. The fact that Crockett Capital

simply left out a critical piece of the properties' development requirements from that presentation indicates that easement was not part of the original agreement.

{119} The Court would be forced to supply missing terms for both the Master Agreement and the implementation provisions for the RDU Aloft, which, according to Crockett Capital, were to be substantially similar for every project. The Court would have to supply terms requiring the Inland affiliate to grant the easement, the term of the easement, and the compensation to be paid for the easement. The complex 156-page document made no mention of these terms, and the parties considered no impasse provisions should a problem with the easement materialize.

{120} The Court will not supply these missing terms to the Master Agreement or to the implementation provisions required for the RDU Aloft property.

{121} Because Crockett Capital insisted that Inland convey the easement to the Joint Venture that would develop the RDU Aloft when that obligation was not part of the original Master Agreement, Inland did not breach the Master Agreement by refusing to execute documents to form the Joint Venture on terms foreign to the Master Agreement.

{122} Crockett Capital's Motion for Summary Judgment on its First Claim for Relief: Breach of Contract Relating to the RDU Aloft Property is hereby DENIED. Defendants' Motion for Summary Judgment on Crockett Capital's First Claim for Relief: Breach of Contract Relating to the RDU Aloft Property is hereby GRANTED.

2.

Crockett Capital's Alleged Fraudulent Inducement
With Respect to the RDU Aloft

{123} Inland claims that it is entitled to rescind the Master Agreement and/or is relieved from its duty to perform under it because Crockett Capital fraudulently induced Inland into entering into the Master Agreement by its failing to disclose that the RDU Aloft project would require the grant of an easement that would significantly and detrimentally impact the adjacent Hilton Garden Inn, owned by

an Inland affiliate.  (Counterclaim ¶ 53(B).)  It also alleges that it was fraudulently induced into approving Crockett Capital's development proposal for the RDU Aloft by Crockett Capital's failure to disclose the need for the easement, and it seeks rescission of that approval.  (Counterclaim ¶¶ 69, 74, 75.)  Inland bases these claims for fraudulent inducement on both actual and constructive fraud.  Crockett Capital seeks summary judgment on these fraud claims.

{124}  The fact that there was no meeting of the minds on the conveyance of the easement as part of the Master Agreement does not imply that Crockett Capital fraudulently induced Inland into entering into the Master Agreement and into proceeding with the RDU Aloft development.  Inland claims that Crockett Capital committed fraud by failing to disclose the need for the easement during its investment presentation.  Though there is dispute about what information Mr. West knew concerning the need for the easement and when he knew it, after the merger, Crockett and/or Winston provided information to Inland in documents explicitly stating the need to use the Hilton Garden Inn's surplus parking for the RDU Aloft.  (Brown Dep. at 508:2–515:3.)  Anyone at Inland who read those documents would have understood that a parking transfer from the Hilton Garden Inn was necessary.

{125} Also, Inland cannot prove that it reasonably relied on the alleged concealment.  Inland states that it had no reason to search public records, a search which would have shown the need for the easement, because it believed Crockett Capital was supplying all relevant information concerning the project.  (Defs.' Resp. Br. 17.)  Crockett Capital did not give Inland information about the easement during its investment presentation, but Inland already had the information in the documents.   It is not reasonable for Inland to rely on an investment presentation for details about: (1) whether to execute the Master Agreement, and (2) whether to proceed in a Joint Venture for the RDU Aloft when its due diligence with respect to the Pipeline Properties should have included at least an inspection of the documents in its possession and possibly title searches for those properties.

{126}  Inland's constructive fraud claim fails for the same reason as above.  The parties never formed a Joint Venture for the RDU Aloft property.  Thus, they are

not fiduciaries with respect to the RDU Aloft project, and Inland cannot support a claim for constructive fraud related to the property.

{127} Inland cannot demonstrate actual or constructive fraud based on Crockett Capital's actions with respect to the RDU Aloft property. Crockett Capital's Motion for Summary Judgment with respect to Defendants' counterclaim Alternative Count II(B): Fraud (Actual or Constructive) and Rescission of the Master Agreement for Crockett Capital's failing to disclose that the RDU Aloft would require the grant of an easement and Alternative Count V: Fraud (Actual or Constructive) and Rescission of RDU Aloft Approval is hereby GRANTED.

3.

Crockett Capital's Alleged Negligent Misrepresentation

{128} Inland claims that Crockett Capital was negligent in failing to disclose to Inland the need for and the impact of the required easement on the adjacent Hilton Garden Inn and in failing to disclose all of the existing and potential competition that the proposed RDU Aloft would face. (Counterclaim ¶¶ 83, 84.) Crockett Capital seeks summary judgment on this claim.

{129} The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care. *Sullivan v. Mebane Packaging Group, Inc.*, 158 N.C. App. 19, 33, 581 S.E.2d 452, 462 (2003). "As with fraud, plaintiff's reliance must have been reasonable in order to recover under a theory of negligent misrepresentation." *Id.*

{130} As noted above, Crockett and/or Winston provided documents to Inland describing the need for an easement to develop the RDU Aloft after the companies' merger. Inland's reasonable due diligence in the Pipeline Properties should have included, at a minimum, an inspection of the documents in its possession that would have demonstrated the need for the easement. Inland did not conduct adequate due diligence on this Pipeline Property. Its reliance on the presentation

and investment summary that Crockett Capital prepared for the RDU Aloft was not reasonable, and it cannot support a negligent misrepresentation claim.

{131} Crockett Capital's Motion for Summary Judgment on Defendants' counterclaim Alternative Count VI: Negligent Misrepresentation – RDU Aloft is hereby GRANTED.

4.

Crockett Capital's Alleged Breach of the Master Agreement
With Respect to the RDU Aloft

{132} Inland claims that Crockett Capital materially breached the Master Agreement by submitting a predevelopment proposal for the RDU Aloft that was materially misleading in its assertion that "[p]arking will be accommodated with on-site surface spaces," when Crockett Capital knew that a significant number of spaces would come from the Hilton Garden Inn. (Counterclaim ¶ 65(D).)

{133} This Court has determined that the Master Agreement does not require Inland to transfer the easement to a Joint Venture with Crockett Capital. Because Crockett Capital cannot insist that Inland grant the easement for free, Inland is not duty-bound to enter into a Joint Venture with Crockett Capital under those terms. Thus, even if Crockett Capital did materially breach the Master Agreement by submitting a misleading development proposal (an issue on which the Court declines to rule), Inland has suffered no damages to support a material breach of contract claim.

{134} Crockett Capital's Motion for Summary Judgment on Defendants' counterclaim Alternative Count IV(D): Submitting an Allegedly Misleading Development Proposal for the RDU Aloft is hereby GRANTED.

D.

CLAIMS RELATED TO THE
HIRING OF BRENT WEST

{135} Inland claims that it was fraudulently induced into entering the Master Agreement by Crockett Capital's fraudulently concealing "ongoing discussions with Mr. West about his becoming employed by [Crockett Capital] and Winston Hospitality, Inc. at a time when Mr. West was representing Inland in the ongoing negotiations over the Development Memorandum and advising Inland as to various development proposals being submitted" by Crockett Capital. (Counterclaim ¶ 53.) It also claims that these facts give rise to a material breach of contract claim. (Counterclaim ¶ 65(E).)

{136} As noted above, in order to prevail on a fraudulent inducement claim, Inland must demonstrate "false representation of a past or subsisting material fact, made with fraudulent intent and with knowledge of its falsity, which representation was relied upon when the party executed the instrument." *In re Estate of Loftin*, 285 N.C. 717, 722, 208 S.E.2d 670, 674 (1974).

{137} Inland claims demonstrate only that Mr. West had contact with Winston concerning his possible employment with a Winston/Crockett entity during the time he was employed with Inland. (*See* Defs.' Resp. Br. 21.) Inland has forecast no evidence that Winston or Crockett actually solicited Mr. West for employment. The Honorable Judge Stephens found in a prior case between these parties in Wake County Superior Court that Mr. West approached Winston about his possible employment and was rebuffed. Winston hired Mr. West only after his employment with Inland was concluded and after he had cleared the hiring with Mr. McGuiness from Inland.

{138} Additionally, Inland has forecast no evidence that anyone from Crockett Capital influenced Mr. West to act contrary to Inland's best interests while he was employed there.

{139} Inland can demonstrate no elements of fraudulent inducement or material breach of contract based on Winston's conversations with Mr. West and Mr. West's

ultimate hiring.  Thus, Crockett Capital's Motion for Summary Judgment on Defendants' counterclaim Alternative Count II(C): Fraud (Actual or Constructive) and Rescission of the Master Agreement and Alternative Count IV(E): Declaratory Judgment – Material Breach of Contract for Crockett Capital's failing to disclose its discussions with Mr. West is hereby GRANTED.

E.

CROCKETT CAPITAL'S ALLEGED MATERIAL BREACH
OF THE MASTER AGREEMENT FOR FAILURE TO
PROVIDE DEVELOPMENT PROPOSALS

{140} Inland alleges that Crockett Capital materially breached the Master Agreement by failing to provide preliminary development proposals to Inland by August 29, 2007.  (Counterclaim ¶ 65(A).)  Crockett Capital seeks summary judgment on this claim.

{141} The Master Agreement sets out deadlines by which Crockett Capital was to submit its first package for each property.  Because the Master Agreement was not signed until July 30, 2007, many of these deadlines turned out to be unrealistic.  (Pl.'s Summ. J. Br. 32.)  Crockett Capital periodically provided updates to Inland on when it would submit the packages, and it met those deadlines.  (Crockett Aff. ¶ 10.)  Crockett Capital did not submit packages for certain of the Pipeline Properties that became unviable.  (Crockett Aff. ¶ 10.)  Inland never complained about these developments.  (Crockett Aff. ¶ 10.)  In fact, Mr. Brown, who took over for Inland in October 2007, stated that he "was fine with what I had seen when I got involved in October." (Brown Dep. 583:10–19.)

{142} Crockett Capital's late submissions were not a material breach of the Master Agreement.  Crockett Capital's Motion for Summary Judgment on Defendants' counterclaim Alternative Count IV(A): Declaratory Judgment – Material Breach of Contract for failing to submit timely development proposals is hereby GRANTED.

## F.
### INLAND'S UNFAIR AND DECEPTIVE
### TRADE PRACTICES CLAIM

{143} Inland alleges that Crockett Capital's common law and/or constructive fraud, its unethical and deceptive actions, and the "substantial aggravating circumstances" surrounding its breach of the Master Agreement constitute unfair and deceptive trade practices within the meaning of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1. (Counterclaim ¶ 61.) Crockett Capital seeks summary judgment on Inland's claim. In order to establish a violation of the UDTPA, a claimant must show: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, which (3) proximately caused actual injury to the claimant." *Nucor Corp. v. Prudential Equity Group, LLC*, 189 N.C. App. 731, 738, 659 S.E.2d 483, 488 (2008).

{144} This Court has granted Crockett Capital's Motion for Summary Judgment on Defendants' fraud claims and Defendants' claims related to any breach of the Master Agreement except with respect to the alleged Pursuit Costs incurred for the RTP Westin. That breach of contract claim does not contain aggravating circumstances that would constitute a claim for unfair and deceptive trade practices. Nor have Defendants forecast evidence to suggest that Crockett Capital's actions were unethical or have a capacity or tendency to deceive. Thus, Defendants have failed to forecast evidence to establish an unfair or deceptive act or practice within the meaning of the UDTPA.

{145} Crockett Capital's Motion for Summary Judgment on Defendants' counterclaim Alternative Count III: Unfair and Deceptive Trade Practices is hereby GRANTED.

## G.
### CROCKETT CAPITAL'S UNFAIR AND DECEPTIVE
### TRADE PRACTICES CLAIM

{146} In its Third Claim for Relief, Crockett Capital asserts that Inland pursued an unfair and deceptive course of conduct, which constituted an aggravated breach

of contract, and which constitutes unfair and deceptive trade practices within the meaning of the UDTPA. Inland seeks summary judgment on the claim.

{147} A breach of contract accompanied by substantial aggravating circumstances violates the statute. *See Johnson v. Colonial Life & Acc. Ins. Co.*, 173 N.C. App. 365, 371 (2005).

{148} First, Crockett Capital contends that Inland wrongfully investigated the "private" e-mails of Crockett Capital and its employees in anticipation of and in connection with the litigation between the parties. (Compl. ¶ 129 (j),(k).) Crockett Capital's e-mails were housed on Inland's server. Inland requested that Crockett Capital discontinue its use of Inland's servers after July 1, 2007, but Crockett Capital requested that it be permitted access to the server after that time. Winston had an expectation that the e-mails would remain private, but no one from Inland made that representation. Furthermore, Crockett Capital had no legal expectation that the e-mails would be confidential. Finally, Inland was required to review e-mails by Crockett Capital employees in response to discovery requests in this litigation. Inland's reading of Crockett Capital's e-mails located on Inland's server does not support a UDTPA violation.

{149} Crockett Capital also contends that Inland violated the UDTPA by filing a lawsuit on the alleged solicitation of Brent West. (Compl. ¶ 129(l).) The filing of an "objectively reasonable" lawsuit cannot constitute an unfair trade practice under the UDTPA. *First Union Nat'l Bank v. Brown*, 166 N.C. App. 519, 534, 603 S.E.2d 808, 819 (2004). Inland's suit concerning Mr. West would extend the law in North Carolina concerning solicitation, but it is not "objectively unreasonable." Thus, it cannot support Crockett Capital's UDTPA claim.

{150} Next, Crockett Capital claims that Inland cut off construction management payments to Crockett Capital "without a good faith basis, thus interrupting [Crockett Capital's] cash flow, in an attempt to coerce Crockett Capital into abrogating the Master Agreement, and forcing Crockett Capital to spend legal fees to recover payments. This claim was settled during arbitration in August 2008. (Def.'s Summ. J. Br. 30.) Neither party admitted liability, and, in accordance with

the settlement agreement, the arbitration was dismissed with prejudice. (Def.'s Summ. J. Br. 30.) Crockett Capital cannot use this settled claim to support its UDTPA assertion.

{151} Crockett Capital's breach of contract claims still viable under this Order and Opinion are the claims related to the Raleigh Hampton/Aloft and Chapel Hill Aloft. Any substantial aggravating circumstances that could form a basis for a violation of the UDTPA must relate to those alleged breaches. The remainder of Crockett Capital's claims are that Inland attempted to coerce it into abrogating the Master Agreement by "holding hotel sites hostage" in a way that would prevent Crockett Capital from generating income (Compl. ¶ 129(a)); concealed that it would abrogate the Master Agreement and misrepresenting its intentions with respect to specific projects, while Crockett Capital was building value in the projects in reliance on the Master Agreement (Compl. ¶ 129(b)); lobbied Starwood and Hilton in a way that damaged Crockett Capital's reputation and the concealment of that effort (Compl. ¶ 129(c), (d), (g), (h)); and misrepresented its intentions with respect to the Raleigh Hampton/Aloft and blocking its development (Compl. ¶ 129 (i)).

{152} While these surviving circumstances may indicate a lack of good faith on the part of Inland, they amount to little more than breach of contract claims. They do not rise to the level of "substantial aggravating circumstances" which violates the statute. Defendants' Motion for Summary Judgment with respect to Plaintiff's Third Claim for Relief: N.C. Unfair and Deceptive Trade Practices Act is hereby GRANTED.

## V.
## CONCLUSION

{153} Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that:

{154} **Plaintiff Crockett Capital's Motion for Summary Judgment on the following claims is hereby GRANTED**:

(1)     Defendants' counterclaim Count I: Declaratory Judgment on the Enforceability of the Master Agreement.

(2)     Defendants' counterclaim Alternative Count II(A): Fraud (Actual or Constructive) and Rescission of the Master Agreement for Crockett Capital's failing to disclose that it caused the name of the purchaser of the RTP Westin to be changed to Winston Hospitality.

(3)     Defendants' counterclaim Alternative Count II(B): Fraud (Actual or Constructive) and Rescission of the Master Agreement for Crockett Capital's failing to disclose that the RDU Aloft would require the grant of an easement.

(4)     Defendants' counterclaim Alternative Count II(C): Fraud (Actual or Constructive) and Recession of the Master Agreement for Crockett Capital's failing to disclose conversations with Mr. West about his becoming employed by Crockett Capital and Winston Hospitality.

(5)     Defendants' counterclaim Alternative Count III: Unfair and Deceptive Trade Practices.

(6)     Defendants' counterclaim Alternative Count IV(A): Declaratory Judgment – Material Breach of Contract for failing to submit timely development proposals.

(7)     Defendants' counterclaim Alternative Count IV(B), (C): Declaratory Judgment – Material Breach of Contract for Crockett Capital's failing to advise Inland that it was causing the identification of the contract purchaser of the RTP Westin to be changed to Winston Hospitality and for its submitting a proposal to Inland to develop the RTP Westin without divulging that the name had been changed.

(8)     Defendants' counterclaim Alternative Count IV(D): Declaratory Judgment – Material Breach of Contract for Submitting an Allegedly Misleading Development Proposal for the RDU Aloft.

(9)     Defendants' counterclaim Alternative Count IV(E): Declaratory Judgment – Material Breach of Contract for Crockett Capital's failing to disclose its discussions with Mr. West.

(10)    Defendants' counterclaim Alternative Count V: Fraud (Actual or Constructive) and Rescission of RDU Aloft Approval.

(12)    Defendants' counterclaim Alternative Count VI: Negligent Misrepresentation – RDU Aloft.

(12)    Defendants' counterclaim Alternative Count VII: Interference with Prospective Economic Advantage.

{155} **Crockett Capital's Motion for Summary Judgment on the following claims is hereby DENIED**:

(1)    Plaintiff's Motion for Summary Judgment on its First Claim for Relief: Breach of Contract Relating to the RDU Aloft.

(2)    Plaintiff's Motion for Summary Judgment on its Second Claim for Relief for Breach of Contract Relating to the RTP Westin.

(3)    Plaintiff's Motion for Summary Judgment on its Second Claim for Relief for Breach of Contract Relating to the Raleigh Hampton/Aloft.

(4)    Plaintiff's Motion for Summary Judgment on its Second Claim for Relief for Breach of Contract Relating to the Chapel Hill Aloft.

(5)    Plaintiff's Motion for Summary Judgment with respect to Defendants' counterclaim Alternative Count VIII: Breach of Contract – RTP Westin Pursuit Costs and Alternative Count IX: Unjust Enrichment – RTP Westin Pursuit Costs.

{156} **Defendants' Motion for Summary Judgment on the following claims is hereby GRANTED**:

(1)    Crockett Capital's First Claim for Relief:  Breach of Contract Relating to the RDU Aloft Property.

(2)    Crockett Capital's Second Claim for Relief Relating to the RTP Westin.

(3)    Crockett Capital's Third Claim for Relief: N.C. Unfair and Deceptive Trade Practices Act.

{157} **Defendants' Motion for Summary Judgment on all other claims is hereby DENIED.**

{158} The remaining claims in this case that are ripe for trial are:

(1)     Plaintiff's Second Claim for Relief for Breach of Contract Relating to the Raleigh Hampton/Aloft.

(2)     Plaintiff's Second Claim for Relief for Breach of Contract Relating to the Chapel Hill Aloft.

(3)     Defendants' counterclaim Alternative Count VIII: Breach of Contract – RTP Westin Pursuit Costs and Alternative Count IX: Unjust Enrichment – RTP Westin Pursuit Costs.

IT IS SO ORDERED, this 28th day of February, 2011.